# APPEAL OF CLAUDE H. BIRDSALL.

Docket No. 3254.    Submitted August 1, 1925.    Decided November 4, 1925.

> 1. During 1919 taxpayer exchanged stock of one corporation having a par value of $40,000 for stock of another corporation having a par value of $17,000.  *Held*, that the evidence is insufficient to show that he sustained a deductible loss on the exchange.
>
> 2. On January 4, 1916, the owner of certain land and the taxpayer entered into an agreement which provided that taxpayer should subdivide and sell the land and pay the entire proceeds derived therefrom to the owner of the land until he should have paid $108,500, plus agents' commissions, and that thereafter taxpayer should receive a percentage of the net profits arising from the sale of the remainder of the land.  *Held*, that the taxpayer did not purchase the land and the amounts received by him from the sale of the land constituted income in the year in which received.

*Samuel D. Patterson, C. P. A.*, for the taxpayer.
*M. N. Fisher, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of deficiencies in income taxes for the years 1919, 1920, and 1921, in the amounts of $3,376.48, $321.67, and $488.42, respectively.

The issues involved are: (1) Whether taxpayer sustained a deductible loss in 1919 upon the exchange of stock; and (2) whether certain amounts received by the taxpayer under a written agreement constituted income.

### FINDINGS OF FACT.

The taxpayer is a resident of the State of New York.

Prior to 1910 the taxpayer and one Butler had developed and perfected a box for the collection and recording of cash fares—such boxes as are now generally in use on street railways.  In the development of this box these two individuals had expended approximately $15,000 cash and about three years in time.

In 1910 the taxpayer and Butler organized the Johnson Fare Box Co. for the purpose of manufacturing and leasing cash-fare collection boxes.  The company was organized with an authorized capital stock of 1,000 shares of common, of the par value of $100 each.  To each of these individuals there were issued 200 shares, but just what they paid into the company for these shares is not clear from the record.

Later, in 1910 or in 1911, the taxpayer purchased additional shares of stock of the Johnson Fare Box Co.  The exact number of shares

acquired at this time is not known. The total purchase price was about $1,100 or $1,200. In 1913 additional shares were purchased by the taxpayer at par, but it is not shown whether they were purchased before or after March 1, 1913; neither do we know the exact number of additional shares acquired. By 1919 taxpayer had acquired and was the owner of shares of stock of the Johnson Fare Box Co. of an aggregate par value of $28,000.

In 1911 and 1912 dividends of 5 per cent and 10 per cent, respectively, were paid by the Johnson Fare Box Co. on its outstanding capital stock.

In 1911 the Johnson Coin Counting Machine Co. and the Standard Coin Counters, Inc., two separate corporations, were engaged in the manufacturing and leasing of coin-counting machines. The taxpayer was the owner of two-thirds of the common stock of the first-mentioned company and Butler owned the other one-third. Neither appears to have owned any stock in the last-mentioned company. Competition in the field in which these two companies were engaged was very keen and was proving disastrous to the Johnson Coin Counting Machine Co. To save the latter company, in which he had a considerable investment, taxpayer conceived the idea of consolidating it with the Standard Coin Counters, Inc., and the merging of the businesses of both in one company under a new charter. This, however, was made impossible because of personal animosities between Butler, who owned one-third of the common stock of the Johnson Coin Counting Machine Co., and the individuals controlling the Standard Coin Counters, Inc. Subsequent negotiations looking to the consolidation of the two companies, with Butler owning an interest in the new company, proved futile.

Finally, in 1919, the situation had become such that the taxpayer realized something had to be done to bring about consolidation of the two companies if the Johnson Coin Counting Machine Co. was to be saved from total failure. After considerable negotiations with Butler, taxpayer induced him to exchange his holdings in the Johnson Coin Counting Machine Co. of a par value of $40,000 for $17,000 par value of stock of the Johnson Fare Box Co. owned by the taxpayer. The exchange was consummated in 1919 and the consolidation of the Johnson Coin Counting Machine Co. and the Standard Coin Counters, Inc., followed.

In his return for the year 1919 taxpayer reported a loss from the transaction, involving the exchange above described, of $9,000. The taxpayer computed this loss on the basis that the stock of the Johnson Fare Box Co. had a value of $17,000 at the time of the exchange, while the stock of the Johnson Coin Counting Machine Co., which he received from Butler, had a fair value of only $8,000.

The Commissioner disallowed the claimed loss on the ground that the taxpayer had failed to prove that he had actually sustained a loss from the exchange.

On January 6, 1916, the taxpayer, together with his brother, Albert D. Birdsall, as parties of the first part, entered into an agreement with Albert L. Lafferty, owner of certain lands situated in the town of Sandwich West, County of Essex, Province of Ontario, Canada, as party of the second part, in terms as follows:

THAT WHEREAS the parties of the first part have agreed and do hereby agree to purchase the premises hereinafter described from said second party under the terms and conditions as herein specifically set forth and specified. and

WHEREAS, it is agreed by and between the parties hereto that the premises herein set forth shall be sold through the agency of the North American Realty Company, a corporation organized under the laws of the State of Michigan, with its principal office in the City of Detroit, State of Michigan; or such other agents or agency as parties hereto may hereafter agree upon, and

WHEREAS, said second party is the owner of the lands and premises hereinafter described:

NOW THEREFORE this agreement witnesseth that for and in consideration of the premises and of the performance and observance of the mutual covenants and provisions contained in this agreement, the parties hereto agree as follows:

1. Parties of the first part shall subdivide and place upon market in lots the south half of lot number thirty-two (32) in the first concession of the Township of Sandwich West, containing one hundred and fifty-five (155) acres more or less, subject however, to grants of right-of-way as have already been made or agreed to be made such subdivision to be made as near as may be in the form of a proposed subdivision now prepared and the "Central Avenue" in the said property from east to west is to be named "Lafferty Avenue." The party of the second part is to do all things necessary on his part to enable registration of the plans to be obtained.

2. The price to be paid to the party of the second part for the said lands is to be the sum of $108,500, of which sum A. D. Birdsall and C. H. Birdsall are this day to pay in cash the sum of $5,000, to be applied as and for the last payment of the said sum of money and to be forfeited in case the provisions of this agreement are not fully carried out on account of the parties of the first part. The price to be increased or reduced according to the true acreage at seven hundred ($700) dollars per acre.

3. In addition to the said sum of $108,500, the party of the second part is to receive as a further compensation for the said lands 20% of the net profits of the sales of the said lands after payment of the said $108,500, and the payment of a sum equal to 35% of the gross sale price of the premises herein described to the selling agent agreed upon, which said sum is to be retained by said Company as their compensation to cover commissions and costs of sale.

4. That the parties of the first part are to sell the lots in the said subdivision at a sum at which the aggregate thereof will be not less than $650,000, and the prices of the lots are to be so fixed as to make it uniform upon all the lots in the said subdivision, having regard to the location thereof one with another.

5. That the parties of the first part are not to make any sale of lots lying west of which is "Harris Street" on the proposed plan and subdivision until

at least they have made bona fide contracts for the sale of other lots in the said subdivision, aggregating in price the sum of $50,000.

6. The parties of the first part by and through said selling agents are to sell the said lots for cash or on the installment plan, but so that the payments for the said lots shall not extend over a longer period than three years, from the date of the contract, and from the moneys received from the said sales said selling agents are first to retain thereout thirty-five per cent thereof, and the balance thereof shall from time to time as hereinafter provided be paid to the party of the second part, such payments to be applied on the said sum of $108,500 until the whole amount shall with the cash payment now made be paid up. The said sum of thirty-five per cent being retained by the said selling agents to cover the cost of selling the said lands as hereinafter stated.

7. When the purchase price of any of the said lots has been fully paid by the purchaser and the amount payable to the party of the second part therefore has been paid, he, the said party of the second part shall convey to the purchaser said lot so paid up by a good and sufficient deed in fee simple free and clear of all encumbrances.

8. The parties of the first part shall pay over to the party of the second part his proportion of the proceeds of the said sales at least every thirty days commencing one month after the registration of the plan and subdivision, and so continue thereafter until all of the lots in the said subdivision are sold. Such payments to be made on the first day of each month and in any event when there shall be the sum of $5,000 in the hands of the Treasurer of the North American Realty Company.

9. The parties of the first part through said selling agents are also to render to party of the second part monthly statements containing the names and addresses of the purchasers of lots, date of agreement, period for which the same has to run and the number and price of lots sold, and to give the standing of each purchaser with the respect to his contract.

10. The parties of the first part agree that within fifteen (15) months from the registration of the plan, as heretofore said, there shall be paid out of the proceeds of the aforesaid a sum which with the amounts theretofore paid shall in the aggregate amount to the sum of $25,000 applicable to the price of the said lands as before set forth and in default thereof this agreement shall be null and void and all payments theretofore made shall become forfeited to the party of the second part, but this provision shall give to the party of the second part no other remedy against the parties of the first part, nor shall it entail any personal liability upon them. But contracts for sale there subsisting are to be carried to completion hereunder.

11. If in obtaining possession of the said premises, or the portion thereof, occupied by him, from the tenant now thereon the party of the second part is obliged to pay to the said tenant any sum to obtain a surrender of the said lands, then the parties of the first part agree to re-pay to the party of the second part on or before the first day of May next, a sum so paid out by him up to the sum of $1,000 and the payments so made by the parties of the first part shall go in reduction of the price of the said property and be included in the said sum of $25,000 referred to hereinbefore.

12. The parties of the first part agree that all of the lots in the said subdivision shall be sold within three years from the date hereof, and that at the end of that period all the rights of the parties of the first part in this agreement and in and to the said subdivision or any profits to be derived therefrom in so far as further sales are concerned shall cease and be determined, and all of the interest of the parties of the first part in that respect shall revert to and become the property of the party of the second part. This clause to be

operative only in case a balance of the fixed price of the said lands still remains unpaid.

13. The contracts for the sale of the said lots shall be taken in the name of the said North American Realty Company or such agent or agents as the parties shall hereto agree upon and designate and the said Sherman Herath, the Manager thereof, or some other person to be agreed upon by the parties in case he should not act, or cease to act, shall receive all the moneys from the purchasers and pay the same over to the respective parties according to the terms of this agreement, and will faithfully discharge his duties in this regard. He shall provide a bond in the sum of $10,000 in favor of the party of the second part, the said bond to be so conditioned as to ensure to the party of the second part his rights under this agreement.

The sale of lots in the subdivision began in 1916 and continued through the years under consideration. The taxpayer received no part of the proceeds derived from the sale of the lots until at or about the middle of 1918, when the payments made by the North American Realty Co. to Lafferty liquidated in full the initial payment of $108,500 to be made to Lafferty under the terms of the agreement. Thereafter, the taxpayer received his proportionate part of the proceeds derived from the sale of each lot after payment of the selling commission to the North American Realty Co. and the 20 per cent of the net profit to be paid to Lafferty under the terms of the agreement.

The taxpayer reported no income from this source in his returns for the years 1916 and 1917, on the theory that he was not entitled to any part of the proceeds derived from the sale of these lots until the initial payment of $108,500 to be made to Lafferty had been completely liquidated. As a matter of fact, he did not actually receive any of the proceeds from sales of these lots during those two years. In his returns for the years 1918, 1919, 1920, and 1921, taxpayer reported the gross amounts received by him in each of those years from the North American Realty Co. as his proportionate share of the net proceeds, as income, without any reduction whatever to provide for a return of what he now alleges to have been the cost of the lots to him.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

LITTLETON: Where property which was acquired prior to March 1, 1913, is exchanged for other property, with a resulting loss, such loss must be measured under the provisions of section 202 of the Revenue Act of 1918 by the difference between the fair market value of the property received in exchange and the cost, or March 1, 1913, value, whichever is lower, of the property exchanged. Three essen-

tial factors then must be established and proven in order to show that a deductible loss has been sustained, namely: (*a*) Cost of the property exchanged; (*b*) March 1, 1913, value of the property exchanged; and (*c*) fair market value of the property received in exchange. Lacking evidence to establish any one of these three factors, a claimed loss must be disallowed.

In the instant appeal the taxpayer exchanged $17,000 par value of capital stock of the Johnson Fare Box Co. for $40,000 par value of capital stock of the Johnson Coin Counting Machine Co. He felt impelled, so he testified, to make this exchange at what he then believed to be a sacrifice, in order that he might be in a position to bring about the consolidation of the Johnson Coin Counting Machine Co. with the Standard Coin Counters, Inc., by which he hoped to save the first-mentioned company from financial disaster and complete failure, thereby circumventing a threatened loss of his entire investment in that company. He has estimated that the stock which he exchanged had a value of $17,000, and he testified that the fair market value of the stock received in exchange was not in excess of $10,000, and these things indicate to him that he sustained a loss of $7,000 from the exchange. But, as we have already pointed out, the determination that a loss was actually sustained, and the amount thereof, must be based upon factors other than these.

Upon the evidence adduced in this appeal we have been unable to find, as our findings of fact will indicate, little more than the fact that the exchange actually took place. The cost of the property exchanged and the fair market value of the property received in exchange have not been established by competent evidence. Under the circumstances we can not find that the taxpayer actually sustained a loss from this transaction.

The taxpayer now contends that the net income of the years 1916, 1917, and 1918, as shown by his tax returns, was understated and the net income of the years under consideration was overstated through failure properly to compute the actual profits derived from the sale of these lots. He further contends that he and his brother actually purchased the lots at a cost of $108,500; that this cost should be spread ratably over the total number of lots in the subdivision; and that, in determining what part of the proceeds received by him from the sale of each lot represents a taxable profit, there should be applied against such proceeds the same proportion of the ratable cost of the lot as the proceeds received during the year bear to the total expected proceeds which will accrue to him from the sale of the lot.

The taxpayer during the year 1915 engaged jointly with his brother in an enterprise involving the subdivision of the land described in the findings into lots and the sale thereof. In pursuance of this arrangement an agreement was signed on January 6, 1916.

between the taxpayer and his brother, as parties of the first part, and Albert L. Lafferty, as owner of the land, by the terms of which agreement the taxpayer and his brother agreed to subdivide a tract of land owned by the said Albert L. Lafferty into lots and sell such lots on the installment plan. Such lots were to be sold through the agency of the North American Realty Co. The agreement provided that the total gross selling price for all of the lots should not be less than $650,000; that the subdivision and sale of such lots should not extend over a period greater than three years; and that taxpayer should not receive any portion of the sale price of lots until $108,500 should have been paid to Albert L. Lafferty, the owner of the property.

The taxpayer did not receive any payments for his share of the profits until the latter part of the year 1918, although he claims that most of the lots were sold prior to the year 1918, and he assumed that, inasmuch as his income was reported on the cash receipts and disbursements basis, such income should not be reported until actually received. He now claims that he should have the right to exercise the option of reporting either his proportion of the profits for the year in which sales were made or deducting the proportion of costs from moneys as received. In pursuance of such claim the taxpayer now demands the right to submit amended returns for all of the years 1916 to 1921, inclusive. The Board is not concerned with the question of whether the taxpayer should file amended returns for the years claimed. The question upon which this Board must pass is whether the deficiency, as determined by the Commissioner and which is involved in this appeal, is correct. This brings us to the point at issue, which is narrowed down to the true construction of the agreement dated January 6, 1916.

The taxpayer contends that the agreement constituted the purchase of the land and that the actual purchase was contemplated in the agreement, and therefore he should be permitted to report the sales of the lots made each year, and, after deducting the cost and expenses, return the balance for each year in which the sales of lots were made, although he received no actual income for any work performed or sales made until the latter part of the year 1918. In support of this contention he has adopted certain isolated words and phrases of the agreement, thereby claiming that the agreement was one of sale of real estate. In construing the agreement in question it is necessary that the contract be taken as a whole. The intention of the parties which courts seek to discover in construing a contract is to be gathered not from particular words and phrases but from the whole context of the agreement. It is a settled rule of law in the construction of contracts that the interpretation must be of the entire instrument and not merely disjointed or particular

parts of it. The contract must be viewed from beginning to end, for one clause may modify, limit, or illuminate the other.

By reading the contract carefully and taking the whole context of the agreement, we are of the opinion that the agreement in question is not a contract for sale of real estate but an agreement between the taxpayer and the owner of the land to perform certain work within a specified time—that is, to subdivide the land into lots and place such lots upon the market to be sold through selling agents agreed upon, or to be agreed upon, by the parties to the contract in question. The agreement was nothing more than a sales agency contract between the owner of the land and the taxpayer. The taxpayer could not at any time have demanded anything more than the payment to him of the commission to which he was entitled for lots sold after the owner of the land had received the sum of $108,500. He at no time had title to land, but all deeds to lots were made by Lafferty with the purchasers. The taxpayer was merely the selling agent of Albert L. Lafferty and any money received from this source was, therefore, income in the year in which it was received.